## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

**CRYSTAL DAWN SORRELLS,**

                    **Plaintiff,**

         **vs.**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social**
**Security Administration,**

                    **Defendant.**

**4:12CV3255**


**ORDER**

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner).[1]  Crystal Dawn Sorrells (Sorrells) appeals the Commissioner's decision denying Sorrells' application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401, *et seq.* and Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  Sorrells alleges she was disabled as of January 1, 2008, due to diabetes, obesity, depression, anxiety, bipolar disorder, obsessive compulsive disorder, and a history of seizure disorder.   Sorrells filed a brief (Filing No. 16) in support of this administrative appeal.  The Commissioner filed the administrative record (AR.) (Filing No. 11) and a brief (Filing No. 21) in opposition of Sorrells' appeal for benefits.  Sorrells did not file a brief in reply.


### BACKGROUND

On February 26, 2010, and March 2, 2010, Sorrells filed an application for disability benefits and SSI alleging her disability began January 29, 2000 (AR. 134-148). The Commissioner denied benefits initially and on reconsideration (AR. 73-77, 80-84). An administrative law judge (ALJ) held a hearing on July 26, 2011 (AR. 30-68).  On October 21, 2011, the ALJ determined Sorrells was not disabled as defined by the Act from January 1, 2008,[2] through the date of decision (AR. 10-23).  The Appeals Council

---

[1]  The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  **See** Filing No. 15.
[2]  Sorrells amended her alleged onset date to January 1, 2008, during the hearing before the ALJ (AR. 10, 34-35).

denied Sorrells' request for review on October 25, 2012.  Sorrells now seeks judicial review of the ALJ's determination as it represents the final decision of the SSA Commissioner.

Sorrells argues the Commissioner's decision should be reversed and benefits awarded because the ALJ improperly discounted the opinion of a treating mental health practitioner on the basis therapists are not acceptable medical sources and the ALJ improperly provided greater weight to opinions from non-treating, non-examining medical sources.  **See** Filing No. 16 - Brief p. 3-4.  After reviewing the ALJ's decision, the parties' briefs, the record, and applicable law, the court finds the ALJ's ruling, that Sorrells was not disabled, is supported by substantial evidence in the record as a whole.

## ADMINISTRATIVE RECORD

### A.    Medical Records

On June 28, 2006, Sorrells was admitted to Great Plains Regional Medical Center (GPRMC) for a primary low transverse cesarean (AR. 298).  The surgeon noted Sorrells' preoperative diagnoses was diabetes requiring insulin and suspected macrosomia (AR. 298).  The surgeon noted Sorrells tolerated the procedure well and was in stable condition upon completion of the surgery (AR. 298).

Sorrells went to Midland Family Medicine (Midland) to report elevated blood sugar on February 26, 2008 (AR. 427).  Mary Dailey (Ms. Dailey)[3] increased Sorrells' insulin dosage (AR. 427).  Sorrells reported improved blood sugar during a follow-up appointment on March 4, 2008 (AR. 426).  On March 18, 2008, Sorrells went to Midland to check her blood sugar and diet (AR. 424).  The examiner noted her blood sugar levels were good in the morning, horrible at lunch, and high at supper (AR. 424).  The examiner adjusted Sorrells' insulin regimen (AR. 424).

Sorrells saw Victor de Villa, M.D. (Dr. de Villa), an endocrinologist, for diabetes management on June 12, 2008 (AR. 337-38).  Dr. de Villa noted Sorrells was depressed, forgetful, and experienced loss of sleep (AR. 337).  Dr. de Villa did not note any symptoms of dizziness or fainting (AR. 337).  Sorrells reported she used an insulin

---

[3] Ms. Dailey's credentials are not indicated in the record.

pump on and off (AR. 337). Dr. de Villa adjusted Sorrells' insulin regimen and advised her to test her blood sugar regularly (AR. 476).

On July 10, 2008, Sorrells saw Dr. de Villa for a check-up on Sorrells' diabetes (AR. 320). Sorrells reported problems with depression, blurred vision, and was on and off her insulin pump (AR. 320). Dr. de Villa noted Sorrells' glucose readings were "much better," she walks regularly and mows the lawn, and was "feeling well" overall (AR. 320-321). Dr. de Villa opined Sorrells was alert, cooperative, and well groomed (AR. 320).

On July 16, 2008, Sorrells saw Mark R. Young, M.D. (Dr. Young), for an eye examination (AR. 629). Dr. Young noted Sorrells' vision was 20/20 in each eye with a few dot-and-blot hemorrhages and microaneurysms (AR. 629). Dr. Young recommended a re-examination of Sorrells' eyes after she gives birth to her second baby (AR. 629).

On August 11, 2008, Dr. de Villa noted further improvement in Sorrells' blood sugar levels (AR. 327-28). On September 4 and 11, 2008, Dr. de Villa made adjustments in Sorrells' insulin pump to address high glucose readings (AR. 335-336). Dr. de Villa noted additional improvement on September 17, 2008, although Sorrells' glucose readings in the early morning were "lowish" (AR. 323-326). Dr. de Villa noted that Sorrells' insulin requirements would change after she gave birth (AR. 325). Dr. de Villa also examined Sorrells on September 20, 2008, the day after she delivered her baby, to review Sorrells' glucose levels and insulin pump (AR. 341). Dr. de Villa noted Sorrells' glucose levels were at acceptable limits (AR. 342).

On November 21, 2009, GPRMC emergency room admitted Sorrells following a seizure (AR. 362). The examining doctor noted Sorrells was in stable condition (AR. 362). Sorrells told an examiner that her blood sugar had been running low and she was not aware when her levels were low (AR. 362). A doctor diagnosed a "[s]eizure of uncertain etiology," noted the seizures "may be diabetic related," and ordered tests (AR. 363). Magnetic Resonance Imaging (MRI) and Computed Tomography (CT) scans of Sorrells' head showed no acute abnormalities (AR. 368, 369). Results of an Electroencephalogram (EEG) test were abnormal, but did not show "clear epileptiform activity" (AR. 373). On January 9, 2010, Sorrells went to Midland and reported anxiety,

3

depression, and dizziness following her seizure (AR. 416).  An examiner prescribed an antidepressant (AR. 416).

On February 1, 2010, Sorrells saw Sona K. Shah, M.D. (Dr. Shah), a neurologist for complaints of dizziness and decreased memory (AR. 400-403).  Dr. Shah noted Sorrells had normal recent and remote memory, normal attention span and concentration, normal cranial nerves, intact sensation, and full strength (AR. 402).  She also walked with a normal gait (AR. 403).  Dr. Shah suspected that Sorrells' seizure might have been caused by low blood sugar and discussed hypoglycemic seizures with Sorrells (AR. 403).  Dr. Shah warned Sorrells to begin tracking her blood sugar levels again (AR. 403).  Dr. Shah asked Sorrells to refrain from swimming and bathing her children (AR. 403).  Dr. Shah ordered another EEG test, which showed "mildly abnormal results" without clear epileptiform activity (AR. 403-404, 354).

Sorrells saw Dr. Shah again on February 11, 2010, for a routine follow-up appointment (AR. 405-407).  Dr. Shah noted Sorrells did not take initiative to monitor her diabetes in the past but expressed willingness to change (AR. 407).  Dr. Shah informed Sorrells that abnormal severe variations in blood sugar can be a reason for a seizure (AR. 407).  Dr. Shah diagnosed uncontrolled diabetes and referred Sorrells to an endocrinologist for diabetes management (AR. 407).

On February 22, 2010, Sorrells saw Ms. Daily at Midland (AR. 413).  Sorrells stated she wanted to discontinue her insulin pump and switch to oral insulin because it was less expensive (AR. 413).  Ms. Dailey advised Sorrells see an endocrinologist (AR. 413).  She also prescribed Sorrells anti-anxiety medication (AR. 413).

On March 18, 2010, Sorrells completed a Daily Activities and Symptoms Report (AR. 238-243).  Sorrells reported her typical day included taking care of her children and completing housework, such as grocery shopping, laundry, and cooking (AR. 238-239).  Sorrells' reported chores or any activity decreased her blood sugar level and made her tired (AR. 238-243).  Sorrells sleeps about eight to nine hours a night and does not take naps (AR. 239).  Sorrells reported she could climb a flight of stairs and had no problems sitting (AR. 239).   Sorrells described her symptoms as tired, dizzy, confused, disoriented, shaky, and sad (AR. 240).  Sorrells' noted her symptoms were "out of control" and located "everywhere" (AR. 240).  Sorrells also reported she had a seizure

on November 21, 2009, but had not experienced another seizure and was not on any seizure medication (AR. 244-246).  Also on March 18, 2010, Vicki L. Dugger (Ms. Dugger), Sorrells' mother, completed a Third Party Function Report and Statement (AR. 248-253, 261-266).  Ms. Dugger generally reported that Sorrells is unable to work and is permanently disabled with diabetes (AR. 248-253, 261-266).

On April 7, 2010, Lisa Jones, Ph.D. (Dr. Jones), completed a consultative mental examination (AR. 487-493).  Sorrells reported she was diagnosed with diabetes in 1997 and takes several shots of insulin each day (AR. 489).  Sorrells also reported kidney and eye problems due to her diabetes (AR. 489).  Sorrells reported problems with anxiety, panic attacks, and depression (AR. 489-490).  Dr. Jones noted Sorrells did not report any other medical history (AR. 489).  Sorrells told Dr. Jones she worked part-time at Timesaver, a gas station, for six hour shifts, two days a week (AR. 489).  Sorrells previously worked at Wells Fargo Bank, First National Bank, and Shopko (AR. 489).  Sorrells stated she quit working at Shopko because of her pregnancy (AR. 489).

Dr. Jones observed Sorrells appeared well-oriented and alert and had an intense affect and an angry, irritable, or depressed mood (AR. 492).  Sorrells' recent and remote memory appeared moderately impaired (AR. 492).  Dr. Jones noted Sorrells did not report any difficulty in terms of maintaining social functioning (AR. 492).  Dr. Jones opined Sorrells has the ability to sustain concentration and attention, to understand and remember short and simple instructions, to adapt to changes within her environment, and to relate with coworkers and supervisors (AR. 492).  Dr. Jones diagnosed panic disorder and bipolar II disorder and assigned Sorrells a Global Assessment of Functioning (GAF)[4] score of 50[5] (AR. 493).

In a form completed as part of her evaluation, Dr. Jones indicated Sorrells was restricted in terms of daily activities, and experienced recurrent episodes of deterioration (AR. 494).  However, Dr. Jones opined Sorrells did not have difficulties in social

---

[4]  The Global Assessment of Functioning (GAF) is a clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30-32 (4th ed. text rev. 2000) (DSM-IV-TR).

[5]  A GAF score of 41 through 50 is characterized as serious symptoms (e.g., suicidal ideation, several obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  **See** *id.* at 32.

functioning and could understand, remember, and carry out short and simple instructions (AR. 494).

Lee Branham, Ph.D. (Dr. Branham), a state agency psychologist, completed a Psychiatric Review Technique form (PRT) and Mental Residual Functional Capacity Assessment (MRFCA) on April 29, 2010 (AR. 499-501). Dr. Branham noted Sorrells had moderate limitations in understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, and working in coordination with or in proximity with others without being distracted (AR. 499). Dr. Branham noted Sorrells was not otherwise significantly limited in the following categories: understanding and memory, sustained concentration and persistence, social interaction, and adaptation (AR. 499-501).

In the PRT, Dr. Branham opined Sorrells was moderately limited in activities of daily living and in maintaining concentration, persistence, or pace and mildly limited in social functioning (AR. 504-514). Dr. Branham noted Sorrells alleged depression, although Dr. Branham opined there was not strong enough evidence to support a clear diagnosis (AR. 516). Dr. Branham noted Sorrells suffered from anxiety, although she was able to handle the interview without excessive anxiety (AR. 516). Dr. Branham concluded evidence did not show that anxiety or depression would prevent Sorrells from working (AR. 516). Patricia Newman, Ph.D. (Dr. Newman), a state agency psychologist, reviewed Sorrells' record and affirmed Dr. Branham's April 29, 2010, assessment (AR. 622).

On May 14, 2010, Jerry Reed, M.D. (Dr. Reed), a state agency physician, conducted a physical residual functional capacity (RFC) assessment of Sorrells based on the medical record (AR. 519-527). Dr. Reed noted Sorrells' primary diagnosis was diabetes mellitus with a secondary diagnosis of seizures (AR. 519). Dr. Reed determined Sorrells could lift less than ten pounds frequently and ten pounds occasionally, could stand at least two hours in an eight-hour work day, could sit for about six hours in an eight-hour work day, and could push and pull with no limitations (AR. 520). Dr. Reed also noted Sorrells could never climb ramps, stairs, ladders, ropes, or scaffolds (AR. 521). Dr. Reed concluded Sorrells did not have manipulative, visual, or communicative limitations (AR. 522-523). Dr. Reed opined Sorrells should avoid

6

concentrated exposure to extreme heat and humidity and avoid hazards such as machinery and heights (AR. 523). Dr. Reed concluded Sorrells had a severe condition, but should be able to work (AR. 526). A second agency physician, Gerald Spethman, M.D. (Dr. Spethman), affirmed Dr. Reed's assessment (AR. 624).

Sorrells underwent a pre-treatment psychological assessment with Brad Bigelow, Ph.D. (Dr. Bigelow), on October 13, 2010 (AR. 625-29, 677). Sorrells had a relatively bright affect, normal speech and thought content, fair judgment and insight, adequate attention and concentration, grossly intact memory, and adequate impulse control (AR. 625). Dr. Bigelow noted Sorrells suffered from depression, anxiety, PTSD, and diabetes mellitus (AR. 628). Dr. Bigelow assigned Sorrells a GAF score of 60[6] and recommended Sorrells seek counseling (AR. 628-629).

On November 9, 2010, Sorrells went to Midland with complaints of diabetes and anxiety (AR. 634). The examiner noted Sorrells needed to take her children to daycare when Sorrells became anxious, angry, and out of control to allow Sorrells to work on her anxiety (AR. 634). On November 12, 2010, Ms. Dailey completed an "incapacity statement" for Sorrells (AR. 635). Ms. Dailey stated Sorrells has severe and uncontrollable diabetes, anxiety, and depression (AR. 635). Ms. Dailey noted Sorrells has been diagnosed with diabetes since Sorrells was thirteen and her anxiety has increased since having children (AR. 635). Ms. Dailey further noted Sorrells' low blood sugar, anxiety, and depression incapacitate Sorrells and prevent her from doing activities of daily living and taking care of her children (AR. 635).

On December 28, 2010, Sorrells began attending counseling with S. Kalana Hylton-Creek (Ms. Hylton-Creek) (AR. 668-688). Sorrells continued to see Ms. Hylton-Creek into July 2011 (AR. 668-688). During treatment, Ms. Hylton-Creek and Sorrells discussed Sorrells' diabetes, eating disorder, anxiety, obsessive-compulsive disorder (OCD), daily activities, and other issues (AR. 668-688). Ms. Hylton-Creek had Sorrells complete tasks and workbooks to help Sorrells cope with her issues (AR. 668-688). On a June 14, 2011, appointment, Ms. Hylton-Creek noted Sorrells suffered from bulimia (AR. 683). Sorrells reported her medications were effective, but she did not always take

---

[6] A GAF score of 51 through 60 is characterized as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers). **See *id.* at 32.**

the recommended dosages of medicine (AR. 668-688).  Sorrells informed she had a boyfriend, goes to the gym, and volunteers at "Kids Klub" to observe childcare workers and practice her own childcare skills (AR. 672-673, 684).  Sorrells also informed Ms. Hylton-Creek that Sorrells went on a family vacation (AR. 688).

On February 2, 2011, Sorrells returned to Midland to report dizziness and nausea (AR. 639).  An examiner suspected seizures, but planned to wait for input from Dr. Shah (AR. 639).  The examiner noted Sorrells' "blood sugars are running great" (AR. 639).

Sorrells saw Dr. Shah on February 3, 2011 (AR. 648).  Dr. Shah noted she had not seen Sorrells for about one year (AR. 648).  Sorrells reported dizziness, tiredness, and confusion (AR. 648).  Sorrells reported she had no seizures over the last year, although she may have had a seizure in her sleep (AR. 648).  During Dr. Shah's examination, Sorrells was alert and oriented, with no impairment in recent or remote memory, normal attention and concentration, normal cranial nerves, full strength, and a normal gait (AR. 649-650).  Dr. Shah ordered an updated EEG test, which did not show epileptiform activity (AR. 632, 650).

During a follow-up appointment with Dr. Shah on February 8, 2011, Sorrells said she was satisfied with treatment, her constant dizziness had gone away, and she felt much better than she had in the past (AR. 651).  Sorrells reported further improvement during a March 29, 2011, appointment (AR. 655-656).  On June 13, 2011, Sorrells went to Midland for depression treatment and reported no success with medication (AR. 694).  An examiner prescribed a new mood medication (AR. 694).  Sorrells met with Dr. Shah again on June 15, 2011 (AR. 690-693).  Sorrells reported she was satisfied with treatment, although her dizziness continued (AR. 690).  Dr. Shah gave Sorrells "pointers on remembering how not to forget medicines" (AR. 693).

On June 13 and 23, 2011, Sorrells returned to Midland and reported issues with depression and medication (AR. 694-695).  An examiner prescribed a different medication and Sorrells reported doing "pretty well" overall on June 27, 2011 (AR. 694-696).  On July 16, 2011, Sorrells went to Midland and reported continued dizziness (AR. 697).  The examiner scheduled Sorrells for an MRI (AR. 697).

**B.       Administrative Hearing**

Sorrells testified she was twenty-seven years old, 5' 9.5", and 179 pounds (AR. 35, 46).  Sorrells' highest level of education was the twelfth grade (AR. 35, 47).  Sorrells was previously married but divorced in January 2011 (AR. 47).  She has two children, ages two and five, who live with her (AR. 35-36, 47).  Sorrells is the primary caregiver for her children (AR. 40).

Sorrells stated some days she lays on the couch all day but other days her "mania will take over and all [she] does is clean" (AR. 41).  On a day when Sorrells feels average, she will wake up and take her children to daycare at 10:30 a.m. (AR. 41).  After she takes the children to daycare, Sorrells will do the dishes or do whatever needs to be done around the house (AR. 41).  Sorrells cooks, drives, goes shopping at the grocery store, and does the laundry (AR. 42).  Sorrells will then take a nap (AR. 41).  After the nap, Sorrells prepares dinner, retrieves her children from daycare, makes dinner, bathes her children, and get her children down for bedtime at 8:30 p.m. (AR. 41-42).  Sorrells does not play with her children because of her dizziness (AR. 41).  Sorrells has trouble cooking because she has "an OCD about sweating" from the stove heat (AR. 57).  Sometimes Sorrells has to drink juice while cooking to keep her blood levels high (AR. 57).

Sometimes Sorrells will go days without showering because she does not have the energy to shower (AR. 53).  If Sorrells takes a bath, she has to call her mother because Sorrells might have a seizure (AR. 57).  Sorrells has problems sleeping and has not had a normal sleep cycle for years (AR. 57-58).  Sorrells might sleep all day and night because of her mental health issues of depression and mania (AR. 58).

Sorrells sometimes falls over when she is standing still and does not do a lot of walking; however, Sorrells can walk for about twenty minutes and walk around a track twice and still feel comfortable (AR. 43-45).  Sorrells can stand for two hours before her kidneys and feet start hurting (AR. 45).  After standing for two hours, Sorrells' legs become sore and she experiences back pain (AR. 51)  Sorrells attempts to work out at home but has issues with dizziness (AR. 43).  Sorrells can sit fifteen to twenty minutes before she has to stand (AR. 45).  Sorrells can lift approximately twenty pounds (AR. 45).

Sorrells was diagnosed with insulin-dependent diabetes in 1999 (AR. 37).   As treatment, Sorrells uses an insulin pump because she forgets to take her insulin shots (AR. 37).   Sorrells admitted her diabetes was not well controlled (AR. 37-38).   Sorrells stated she has been more focused on addressing her mental health issues of depression, anxiety, bipolar disorder, and seizures because those issues have been worse (AR. 37-38).   Sorrells has only experienced one grand mal seizure (AR. 38-39, 50).   However, Sorrells experiences dizziness every day and there are no warning signs before Sorrells becomes dizzy (AR. 50).   In 2011, Sorrells reported to her neurologist her dizziness subsided while taking Trileptal (AR. 39).   Sorrells testified she experienced a grand mal seizure in November 2009 (AR. 50).   Sorrells believes she has one to two seizures a week where she "blank[s] out" (AR. 49-50).   Sorrells' testified her EEGs are abnormal with some swelling in her right temporal lobe, however there is no indication of epilepsy (AR. 40).   Sorrells sometimes agrees with her neurologist that her seizures and dizziness result from her anxiety (AR. 42-43).   Sorrells testified she believes her doctors are starting to get overwhelmed with her complications and visits (AR. 44).

Sorrells stated she suffers from PTSD, which was diagnosed when Sorrells was a teenager (AR. 53).   Sorrells testified she has a history of self-mutilation but gets tattoos now to deal with those thoughts in a healthier way (AR. 59).   Sorrells did burn herself three months prior to the hearing because the physical pain of the burn is easier to handle than the emotional pain (AR. 59-60).

Sorrells' primary treating physician is Dr. Sita[7] and doctors at Midland (AR. 56).   During Sorrells' doctor appointment with Dr. Jones in 2010, Sorrells did not tell Dr. Jones about Sorrells' eating disorder because she only recently realized she had a problem (AR. 52).   Sorrells testified since seeing Dr. Jones in April 2010, Sorrells' anxiety and panic attacks have worsened (AR. 53).   Sorrells occasionally sees a therapist, who she originally saw in 2008 for marriage counseling, to help Sorrells improve her health (AR. 52).   Sorrells believes her appointments with her therapist have helped (AR. 58-59).

---

[7] Sorrells' medical records do not contain records of a Dr. Sita.

Sorrells takes Trileptal, Humalog, Xanax, and Respiradol (AR. 42, 55-56). Sorrells testified the Respiradol makes her woozy, Humalog decreases her blood sugar, and Xanax makes her sleepy (AR. 45-46). Sorrells stated the medications are definitely helping and she does not get nauseous or vomit while on the medications (AR. 42).

At the time of the hearing Sorrells was not working, however three to four months prior, she tried to go back to work as a cashier at Timesaver, a gas station, where she worked periodically in between medical leaves of absence since 2009 (AR. 36, 47-48). Sorrells would work six-hour shifts two days a week at Timesaver (AR. 36). Sorrells testified she is unable to work full-time because her diabetes is "very, very difficult to deal with" (AR. 36-37, 48). Sorrells would start a normal workday with her blood sugar level at 300-400 and end the workday at 50 (AR. 37). Sorrells would fight through the low blood sugar level but she would get to the point where all she could do is lay on the couch (AR. 37). Sorrells testified she worked at First National Bank for eight months in 2007 but was fired due to sickness and a weak immune system (AR. 54). Sorrells also worked at Shopko but quit that job due to pregnancy (AR. 46). Sorrells testified she mentally cannot function without working; however, Sorrells does not believe she could return to past work with her current conditions (AR. 54-55). Sorrells made approximately $1000 in the first quarter of 2010, approximately $1800 in the second quarter of 2010, and approximately $800 in the third quarter of 2010 (AR. 36).

Sorrells testified when her blood sugar was low at work she would become very ill, moody, and lash out at customers and coworkers (AR. 48). Sorrells would also cancel doctor's appointments because she would have to sleep after work (AR. 48-49). Sorrells testified she "really just [has] a problem with people in general, the human race bothers [her]" (AR. 54).

Sorrells testified although she is supposed to check her blood sugar level six times a day, she does not monitor her blood sugar (AR. 49). Within the five days prior to the hearing, Sorrells testified she checked her blood sugar level once (AR. 49). Sorrells does not monitor her blood sugar regularly because she loses the meter to measure blood sugar or she does not remember to check her blood sugar (AR. 49). Sorrells testified "[w]hen [she] work[s], [she] really [has] a hard time even remembering to take [her] blood sugar" (AR. 37). Sorrells wore her insulin pump at the time of the

hearing, however she will "get sick of it being attached to [her] body . . . [and will] take it off" (AR. 51).   Additionally, Sorrells will forget to put the insulin pump on after she showers (AR. 51).

Jennifer Tashira, a vocational expert (VE), testified in response to the ALJ's hypothetical questions outlining Sorrells' age, education, and work experience (AR. 62-65).  The ALJ limited hypothetical individual number one to performing light exertional level work with occasional climbing of stairs and ramps but not ropes, ladders, or scaffolds (AR. 63).   Additionally, the individual would have to work in a temperature-controlled environment and avoid concentrated exposures, unprotected heights, and hazardous machinery (AR. 63).  Further, the individual is limited to unskilled work which requires no more than occasional contact with the public and coworkers (AR. 63).   The VE testified individual one could not perform past relevant work (AR. 63).  However, the VE testified individual one could work in the national and regional economy (AR. 63).  Specifically, individual one could function as a mail clerk, housekeeper, and electrical assembler (AR. 63-64).   The VE testified there are 1310 jobs as a mail clerk in Nebraska and 138,990 jobs in the United States; 1670 jobs as a housekeeper in Nebraska and 915,890 jobs in the United States; and 1300 jobs as an electrical assembler in Nebraska and 216,470 jobs in the United States (AR. 63-64).

The ALJ limited hypothetical individual number two to performing sedentary exertional level work with the limitation that individual two could never climb stairs, ramps, ropes, ladders, or scaffolds (AR. 64).   Additionally, the individual would have to work in a temperature-controlled environment and avoid concentrated exposures, unprotected heights, and hazardous machinery (AR. 64).   Further, the individual is limited to unskilled work that requires no more than occasional contact with the public and coworkers (AR. 64).  The VE testified individual two could work in the national and regional economy as a stem mounter, stuffer, and eyeglass polisher (AR. 64).  The VE testified there are 1300 jobs as a stem mounter in Nebraska and 216,470 jobs in the United States; 3340 jobs as a stuffer in Nebraska and 368,320 jobs in the United States; and 840 jobs as an eyeglass polisher in Nebraska and 239,550 jobs in the United States (AR. 64)

The ALJ limited hypothetical individual number three to the same limitations as individual two with the added limitation that any job must allow for occasional, unscheduled disruptions of the work day secondary to the necessity to lie down for extended periods of time (AR. 64-65). The VE testified there was no work for individual three in the economy (AR. 64). The VE testified the information provided is consistent with the Dictionary of Occupational Titles (DOT) (AR. 64).

Sorrells' attorney asked the VE whether an individual who is physically and psychologically limited to two days of work per week could be gainfully employed (AR. 65). The VE testified such an individual would be unable to maintain competitive employment (AR. 65).

## THE ALJ'S DECISION

The ALJ concluded Sorrells was not disabled under the Act (AR. 11-23). The ALJ framed the issue as whether Sorrells was disabled under sections 216(i), 223, and 1614(a)(3)(A) of the Act (AR. 10). The ALJ defined disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or last for a continuous period of not less than twelve months (AR. 10). **See** 42 U.S.C. § 423; 20 C.F.R. § 404.1505.

The ALJ must evaluate a disability claim according to the sequential five-step analysis established by the Social Security regulations. **See** 20 C.F.R. § 404.1520(a)-(f); *Phillips v. Astrue*, 671 F.3d 699, 701 (8th Cir. 2012).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). More specifically, the ALJ examines:

> [A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. **See** 20 C.F.R. § 404.1520(a). If the claimant suffers from an impairment that

13

is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience.   If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy.   A claimant's residual functional capacity is a medical question.

*Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (internal citations omitted).   "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled."   *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citation omitted); **see** *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010).

In this case, the ALJ followed the appropriate sequential analysis.   At step one, the ALJ noted although Sorrells worked after January 1, 2008, her amended alleged onset date, Sorrells' work activity did not rise to the level of substantial gainful activity (AR. 12).   At step two, the ALJ determined Sorrells had the following severe impairments as defined by Social Security regulations:   "insulin dependent diabetes mellitus, obesity, history of seizure disorder, bipolar disorder, obsessive-compulsive disorder (OCD), depression and anxiety" (AR. 13).   The ALJ determined the above mentioned severe impairments cause significant limitations on Sorrells' ability to do basic work related activities (AR. 13).   The ALJ concluded Sorrells does not have a medically determinable impairment for bulimia (AR. 13).   The ALJ noted an impairment is not medically determinable unless it is diagnosed or established by an acceptable medical source (AR. 13).   **See** 20 CFR 404.1513(a), 416.913(a).   The ALJ determined Ms. Hylton-Creek, Sorrells' therapist, is not an acceptable medical source under the regulations (AR. 13).   Further, the ALJ concluded Sorrells did not report similar symptoms of binging and purging to her neurologist, endocrinologist, or treating family physician (AR. 13).

At the third step, the ALJ determined Sorrells does not have an impairment or combination of impairments that meets or medically equals one of the listed

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 419.926) (AR. 13).  The ALJ concluded Sorrells' impairments do not cause two marked limitations or one marked limitation and repeated episodes of decompensation of extended duration (AR. 13-14).  The ALJ noted Sorrells' mental impairments result in no limitation in activities of daily living (AR. 14).  The ALJ determined Sorrells has moderate difficulties in social functioning and concentration, persistence, or pace (AR. 14).  Before proceeding to step four of the sequential evaluation process, the ALJ determined Sorrells' ability to perform work-related functions, or RFC, is limited to the following:

> light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) in that [Sorrells] is able to lift and carry twenty pounds occasionally and ten pounds frequently.  [Sorrells] is able to stand and walk for six hours of an eight-hour day and sit for six hours of an eight-hour day.  [Sorrells] can occasionally climb ramps and stairs, but she may never climb ropes, scaffolds, or ladders.  Furthermore, she must avoid concentrated exposure to unprotected heights and hazardous machinery.  [Sorrells] must also work in a temperature-controlled environment.  Mentally, [Sorrells] is limited to unskilled work only, which requires no more than occasional contact with the general public and coworkers.

(AR. 15).

The ALJ found Sorrells' medically determinable impairments could reasonably be expected to cause Sorrells' alleged symptoms; however, the ALJ found Sorrells' statements regarding the intensity, persistence, and limiting effects of such symptoms were not credible (AR. 16).  The ALJ determined Sorrells' compliance with her diabetic regimen has been substandard (AR. 16-17).  The ALJ noted Sorrells forgot to put her insulin pump on after showering and did not regularly monitor her blood sugar level as directed by physicians (AR. 16).  The ALJ further noted Sorrells' medical records show a repeated history of medical non-compliance with insulin therapy and diabetic dieting and exercise (AR. 16).  The ALJ also noted Sorrells has not seen her endocrinologist since September 2008, more than two years prior to the hearing before the ALJ (AR. 16).  The ALJ found Sorrells' diabetes resulted in "very few end organ complications" considering Sorrells' noncompliance with treatment (AR. 16).  Specifically, the ALJ noted after Sorrells' July 16, 2008, appointment where Sorrells' vision was 20/20 with

some dot and blot hemorrhages and microaneurysms, there were no subsequent ophthalmological visits or vision complaints (AR. 16).  The ALJ similarly found the record does not establish any kidney disease or failure or diabetic neuropathy (AR. 16). The ALJ noted although Sorrells experienced a grand mal seizure on November 21, 2009, doctors indicated Sorrells was noncompliant with her diabetes management (AR. 17).  The ALJ noted Dr. Shah concluded Sorrells' loss of consciousness was likely attributed to hypotension and blood sugar volatility secondary to Sorrells' poor control of her diabetes (AR. 17). The ALJ noted Sorrells' examination after her seizure was normal and a CT scan, MRI, and EEG were unable to confirm epileptiform activity (AR. 17).  The ALJ also considered Dr. Shah's finding that Sorrells had an unremarkable physical and neurological examination (AR. 17).

The ALJ stated Sorrells received virtually no treatment between November 2008 and November 2009 for any of her conditions (AR. 17).  Sorrells did not have regular follow-up appointments with her endocrinologist and went nearly a year between visits to her neurologist (AR. 17).  The ALJ noted Sorrells' significant daily activities of being the primary care giver for her two children, driving, shopping, and doing the laundry also eroded Sorrells' credibility (AR. 17).  Sorrells gave inconsistent statements to her work and doctor as to why she left Shopko and lied to her employers regarding absences (AR. 17-18).  The ALJ concluded Sorrells' work history reflected negatively on her credibility (AR. 17-18).

With regard to Sorrells mental impairments, the ALJ concluded the record does not support allegations of life-long anxiety because Sorrells' first complaint of anxiety was in January 2010, nearly two years after her alleged onset date (AR. 18).  The ALJ noted Sorrells maintained a relatively full lifestyle and there are no psychological based limitations on her activities of daily living (AR. 19-20).  The ALJ concluded Sorrells' mental impairments would cause some limitation but would not preclude all work activity (AR. 19-20).  The ALJ determined, after giving Sorrells the benefit of the doubt, Sorrells only has moderate limitations on her social functioning and concentration, persistence, and pace (AR. 20).

The ALJ gave some weight to state agency physicians' opinions requiring postural and environmental limitations for Sorrells, but gave little weight to the state

agency physicians' opinions on Sorrells' ability to lift, carry, stand, and walk because Sorrells testified she could lift and carry twenty pounds and stand for two hours at a time (AR. 18). The ALJ noted Sorrells' own testimony greatly exceeded the state agency physicians' assessments and there are no conflicting opinions from any treating or examining sources regarding Sorrells' physical capabilities (AR. 18).

The ALJ gave no weight to Ms. Dailey's opinion that Sorrells is unable to care for Sorrells' children due to increased anxiety, depression, and uncontrolled blood sugar (AR. 18). The ALJ noted the record does not indicate Ms. Dailey's qualifications and there are no objective findings based on examination to support Ms. Dailey's assessment (AR. 18).

The ALJ gave significant weight to the opinions of the state agency psychologists Drs. Branham and Newman, which are supported by Dr. Bigelow's mental status examination and progress notes from treating therapists and physicians (AR. 21). The ALJ gave less weight to portions of Dr. Jones' opinion as there is no evidence Sorrells' psychological impairments restricted her activities of daily living or evidence of recurrent episodes of deterioration (AR. 21). However, the ALJ gave weight to Dr. Jones' overall conclusion that Sorrells could perform and carry out simple instructions and relate appropriately to coworkers and supervisors (AR. 21). The ALJ gave no special significance to Sorrells' mother's third party function report because the ALJ found the report was based on Sorrells' subjective allegations which were not fully credible (AR. 21).

At step four of the sequential evaluation process, the ALJ determined Sorrells is unable to perform her past relevant work as a service banker and a cashier (AR. 21). The ALJ noted Sorrells was twenty-three years old on the alleged disability onset date, which qualifies Sorrells as a younger individual under 20 C.F.R. § 404.1563 (AR. 21). The ALJ noted Sorrells has at least a high school education and is able to communicate in English (AR. 21).

At the final step in the process, the ALJ determined jobs exist in significant numbers in the national economy which Sorrells can perform (AR. 22). The ALJ relied upon the VE's testimony finding a person of Sorrells' age, education, work experience, and RFC could perform light, unskilled work as a mail clerk, housekeeper, and electrical

assembler (AR. 22).  The ALJ determined because Sorrells could perform unskilled light labor, Sorrells was not disabled (AR. 22).

## STANDARD OF REVIEW

A district court is authorized jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g).  A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole."  ***Young v. Astrue***, 702 F.3d 489, 491 (8th Cir. 2013).  Substantial evidence is defined as less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision.  **See *Jones v. Astrue***, 619 F.3d 963, 968 (8th Cir. 2010); **see also *Minor v. Astrue***, 574 F.3d 625, 627 (8th Cir. 2009) (noting "the 'substantial evidence on the record as a whole' standard requires a more rigorous review of the record than does the 'substantial evidence' standard").  "If substantial evidence supports the decision, then [the court] may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome."  ***McNamara v. Astrue***, 590 F.3d 607, 610 (8th Cir. 2010).  "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error."  ***Nettles v. Schweiker***, 714 F.2d 833, 835-36 (8th Cir. 1983).  The court reviews questions of law de novo.  **See *Miles v. Barnhart***, 374 F.3d 694, 698 (8th Cir. 2004).  Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole.  **See *Nettles***, 714 F.2d at 835; ***Renfrow v. Astrue***, 496 F.3d 918, 920 (8th Cir. 2007).  Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."  ***Pelkey***, 433 F.3d at 578 (**quoting *Guilliams v. Barnhart***, 393 F.3d 798, 801 (8th Cir. 2005)).

## DISCUSSION

## A.    Ms. Hylton-Creek's and Ms. Dailey's Opinions

Sorrells argues "[t]he ALJ discounted the diagnosis of bulemia [sic] by the therapist who advertises in the telephone book as a Licensed Independent Mental Health Practitioner because therapists are not acceptable medical sources.  Ignoring

the evidence of the Mental Health Practitioner is contrary to law."  **See** Filing No. 16 - Brief p. 5.  Sorrells also appears to argue the ALJ did not properly weigh Ms. Dailey's Incapacity Statement for Sorrells.  *Id.* p. 4.

The SSA recognizes two types of sources for evidence that may be used as evidence of an impairment or the severity of an impairment:  "acceptable medical sources" and "other sources."  **See** 20 C.F.R. § 404.1513.  Therapists and nurse-practitioners are listed under "other sources" and are not considered "acceptable medical sources."  20 C.F.R. § 404.1513(d)(1); **see also** *Lacroix v. Barnhart*, 465 F.3d 881, 885-86 (8th Cir. 2006).  An "other source" opinion may be used to show the severity of an impairment and how it affects the individual's ability to function, but may not be used to establish an impairment.  **See** 20 C.F.R. § 404.1513(d); SSR 06-3p. However, "[i]n determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record."  *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (**citing** 20 C.F.R. § 416.927(d)(4)).

Ms. Hylton-Creek, a therapist, and Ms. Dailey do not qualify as acceptable medical sources, nor do their opinions constitute medical opinions under the regulations.  **See** 20 C.F.R. § 416.927(a)(2) (defining medical opinions as "statements from physicians and psychologists or other acceptable medical sources").  The ALJ correctly considered Ms. Hylton-Creek to be an "other source" rather than an acceptable medical source.  As such, the ALJ was required to consider Ms. Hylton-Creek's opinion when evaluating the severity of Sorrells' impairments and the effect her impairments have on her ability to work.  **See** 20 C.F.R. § 404.1513; **see also** Social Security Ruling 06-03p, Titles II and XVI:  Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 71 FR 45593-03 (August 9, 2006).  While the ALJ was required to consider Ms. Hylton-Creek's opinion, the ALJ was not required to accept the opinion or assign it great weight.  *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006).  The ALJ has the discretion to reject or discredit Ms. Hylton-Creek's and Ms. Dailey's opinions if they are inconsistent with other evidence in the record.  **See *id.***

The ALJ explained he disregarded Ms. Hylton-Creek's diagnoses of bulimia because she is not an acceptable medical source.  The ALJ noted Sorrells did not report similar symptoms of bulimia to her neurologist, endocrinologist, or treating family physician.  Additionally, the ALJ explained Ms. Dailey is not indicated as a licensed physician, psychologist, or other acceptable medical source, but appears to be a staff member at Midland, therefore Ms. Dailey's Incapacity Statement is not entitled to great weight.  The ALJ noted there were no objective findings or clinical findings to support Ms. Dailey's Incapacity Statement.  The ALJ properly gave no weight to Ms. Dailey's Incapacity Statement considering Ms. Dailey was not qualified as an acceptable medical source and the statement appeared to be based on Sorrells' subjective complaints rather than objective findings.  **See *Renstrom v. Astrue,*** 680 F.3d 1057, 1064 (8th Cir. 2012) (holding an ALJ may give less weight to an opinion because it appeared to be based on the claimant's subjective complaints).  Nevertheless, although neither Ms. Hylton-Creek nor Ms. Dailey are acceptable medical sources, the ALJ did not ignore their treatment notes but instead considered such notes in formulating Sorrells' RFC.

Sorrells' brief mostly contains quotes from ***Shontos v. Barnhart***, 328 F.3d 418 (8th Cir. 2003), presumably for the proposition that Ms. Hylton-Creek's and Ms. Dailey's opinions should be given greater weight.  In ***Shontos***, the Eighth Circuit Court of Appeals determined a nurse practitioner and a counselor were not acceptable medical sources.  ***Shontos***, 328 F.3d at 425-27.  However, the court considered the nurse practitioner and counselor as treating sources whose opinions were entitled to greater weight because they worked as part of a treatment team that included a psychologist whose participation in Shontos' care gave the entire treatment team treating-source status.  **See *id.***  Sorrells' case is distinguishable from ***Shontos*** because there is no indication Ms. Hylton-Creek or Ms. Dailey worked as part of a treatment team with an acceptable medical source while treating Sorrells.  **See *Lacroix***, 465 F.3d at 886 (distinguishing ***Shontos*** on the same grounds); ***Tindell v. Barnhart***, 444 F.3d 1002, 1005 (8th Cir. 2006) (distinguishing ***Shontos*** and holding the opinions of a therapist who was not "associated with a physician, psychologist, or other acceptable medical source that could potentially give him treating source status" were not entitled to greater weight).

The court finds the ALJ properly discounted Ms. Hylton-Creek's diagnosis of bulimia and Ms. Dailey's Incapacity Statement for the reasons Ms. Hylton-Creek and Ms. Dailey are not acceptable medical sources and those stated in the ALJ's opinion.

**B.     The ALJ's RFC Determination**

Sorrells argues "[t]he major issue in this case is that nontreating, nonexamining medical consultant opinions are relied on by the AL[J] in forming an opinion as to claimant'[s] residual functional capacity."  **See** Filing No. 16 - Brief p. 6.  Sorrells argues the ALJ should have given greater weight to opinions from treating sources.  **Id.** at 7.

There must be substantial evidence on the record as a whole to support the ALJ's RFC determination.  **See Davidson v. Astrue**, 578 F.3d 838, 841 (8th Cir. 2009).  Substantial evidence is relevant evidence a reasonable mind would accept as adequate to support a decision.  **See id.**  It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC.  **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010).  RFC is the most the claimant can still do despite physical and mental limitations based on the evidence in the case record.  **See** 20 C.F.R. § 404.1545(a)(1). The claimant is responsible for providing evidence to establish the RFC.  **See** 20 C.F.R. § 404.1545(a)(3).  Even so, the ALJ is responsible for developing the complete medical history.  **Id.**  The ALJ's determination of a claimant's RFC "must be supported by some medical evidence of the claimant's ability to function in the workplace."   **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  An ALJ may rely upon opinions from non-examining sources as long as the opinions were not the only basis for the ALJ's RFC finding.  **See Hacker v. Barnhart**, 459 F.3d 934, 939 (8th Cir. 2006) (holding the ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors).

In addition to the relevant medical evidence, the ALJ bases the RFC assessment on the relevant non-medical evidence including:  statements and observations provided by the claimant and claimant's family, friends, or other persons.   **See** 20 C.F.R. § 404.1545(a)(3).  When considering the claimant's subjective complaints of pain, the ALJ evaluates:  "1) the claimant's daily activities, 2) the duration, frequency and intensity of pain, 3) precipitating and aggravating factors, 4) the dosage, effectiveness and side

effects of any medication, and 5) functional restrictions." *Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011). When there are inconsistencies in the claimant's testimony, the ALJ may properly discount part of the testimony. *Id.* Similarly, the ALJ may discount conclusions from a medical expert or treating physician if the conclusions are inconsistent with the record as a whole. *Id.* at 615-16. Evidence which both supports and detracts from the decision is considered when determining whether substantial evidence supports the ALJ's decision. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010).

"State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation. Therefore, [ALJs] must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence." 20 C.F.R. § 404.1527(f)(2)(i). While "there are circumstances in which relying on a non-treating physician's opinion is proper[,]" generally, "opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). An ALJ does not err by considering the opinion of a state agency medical consultant along with the medical evidence as a whole. *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

As previously explained, the ALJ properly gave no weight to Ms. Dailey's Incapacity Statement and properly discounted Ms. Hylton-Creek's diagnosis of bulimia. Sorrells does not identify other opinions the ALJ should have considered with greater weight. Sorrells also does not explain what limitations the ALJ failed to include in the RFC determination. Nevertheless, the court will review the ALJ's RFC determination.

In formulating Sorrells' RFC, the ALJ accounted for Sorrells' symptoms and the extent her symptoms could reasonably be accepted as consistent with the objective medical evidence, opinion evidence, and other evidence. To account for Sorrells' seizure history, diabetes, and dizziness the ALJ found Sorrells could occasionally climb stairs and ramps but could not climb ropes, ladders or scaffolds, must work in a temperature-controlled environment, and must avoid concentrated exposures, unprotected heights, and hazardous machinery. **See** AR. 15, 18, 63. After giving Sorrells "the benefit of the doubt" the ALJ accounted for Sorrells' mental limitations by

limiting her to unskilled work with no more than occasional contact with the general public and coworkers.  **See** AR. 15, 18-20.  The ALJ found Sorrells could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday based on Sorrells' own testimony.  **See** AR. 15, 18.

Although the ALJ considered some of Sorrells' testimony and subjective complaints, the ALJ found Sorrells' statements concerning the intensity, persistence, and limiting effects of her symptoms only partially credible.  **See** AR. 16-21.  The ALJ noted Sorrells reported improvement while on medication; however Sorrells had a chronic history of noncompliance with her diabetic regimen.  **See *id.***  Specifically, the ALJ noted numerous instances where medical personnel noted Sorrells' lack of compliance. **See *id.***  The ALJ also noted Sorrells testified she is noncompliant with her medications and treatment.  **See *id.***

The ALJ gave some weight to the opinions of Drs. Reed and Spethman, state agency physicians.  **See** AR 18.  However, the ALJ found their opinions regarding Sorrells' ability to lift, stand, and walk were not supported by the record and Sorrells' own testimony.  **See *id.***  The ALJ gave significant weight to the opinions of Drs. Branham and Newman, state agency psychologists.  **See** AR. 21.  The ALJ noted Drs. Branham and Newman's opinions are consistent with Dr. Bigelow's examination, Ms. Hylton-Creek's progress notes, and progress notes from Midland.  **See *id.***  The ALJ gave less weight to Dr. Jones' opinions but did consider Dr. Jones' overall conclusion that Sorrells could perform and carry out simple instructions and relate appropriately to coworkers and supervisors.  **See *id.***

The ALJ fully and properly evaluated the evidence in the record when determining Sorrells' RFC.  The ALJ properly relied on opinions from non-treating and non-examining medical consultants, opinions from examining physicians, and treatment notes from examining doctors and therapists.  The record supports the ALJ's decision to rely on state agency consultants' opinions to the extent the opinions consistent with the record as a whole.  Therefore, the court finds that, having properly considered the evidence in the record, sufficient evidence supports the ALJ's findings with respect to Sorrells' RFC.

**CONCLUSION**

For the reasons stated herein, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, is supported by substantial evidence in the record as a whole and should not be reversed or remanded. Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED**:

The Commissioner's decision is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

Dated this 28th day of August, 2013.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge

24